**ATLANTIC STATES LEGAL FOUNDATION, INC.,**
Plaintiff–Appellant,

v.

**EASTMAN KODAK COMPANY,**
Defendant–Appellee.

No. 1624, Docket 93–7091.

United States Court of Appeals, Second Circuit.

Argued June 10, 1993.

Decided Dec. 14, 1993.

As Amended Feb. 3, 1994.

Charles M. Tebbutt, Buffalo, NY (Edward Cooper, Allen, Lippes & Shonn, Buffalo, NY, of counsel), for plaintiff-appellant.

Philip H. Gitlen, Albany, NY (Elizabeth M. Morss, Carl F. Patka, Whiteman Osterman & Hanna, Albany, NY, of counsel), for defendant-appellee.

Robert Abrams, Atty. Gen. of the State of New York, Peter Schiff, Deputy Sol. Gen., James A. Sevinsky, Val Washington, Asst. Attys. Gen., Albany, NY, of counsel, for State of New York as amicus curiae.

Michael Axline, Western Environmental Law Clinic, Eugene, OR, Katherine Kennedy, James Simon, National Resources Defense Council, New York City, James R. May, Widener University School of Law Environmental Law Clinic, Wilmington, DE, Matthew McKeown, Joel Morton, David Simonaitis, Jennifer Wright, Law Students, of counsel, for Natural Resources Defense Council, et al. as amicus curiae in support of appellant.

Theodore L. Garrett, Corinne A. Goldstein, Covington & Burling, Washington, DC, David F. Zoll, Sarah M. Brozena, Chemical Mfrs. Ass'n, Robin S. Conrad, Nat. Chamber Litigation Center, Cindy Evans, American Forest and Paper Association, Ellen Siegler, American Petroleum Institute, Washington, DC, of counsel, for Chemical Mfrs. Ass'n, et al. as amicus curiae in support of appellee.

Before: WINTER, McLAUGHLIN, and JACOBS, Circuit Judges.

WINTER, Circuit Judge:

This appeal raises the issue of whether private groups may bring a citizen suit pursuant to Section 505 of the Federal Water Pollution Control Act (commonly known as the Clean Water Act), 33 U.S.C. § 1365, to stop the discharge of pollutants not listed in a valid permit issued pursuant to the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1342 (1988). We hold that the discharge of unlisted pollutants is not unlawful under the CWA. We also hold that private groups may not bring such a suit to enforce New York State environmental regulations.

## BACKGROUND

Appellee Eastman Kodak Company ("Kodak") operates an industrial facility in Rochester, New York that discharges wastewater into the Genesee River and Paddy Hill Creek under a State Pollutant Discharge Elimination System ("SPDES") permit issued pursuant to 33 U.S.C. § 1342. Appellant Atlantic States Legal Foundation, Inc. ("Atlantic States") is a not-for-profit environmental group based in Syracuse, New York.

Kodak operates a wastewater treatment plant at its Rochester facility to purify waste produced in the manufacture of photographic supplies and other laboratory chemicals. The purification plant employs a variety of technical processes to filter harmful pollutants before discharge into the Genesee River at the King's Landing discharge point (designated Outfall 001) pursuant to its SPDES permit.

Kodak first received a federal permit in 1975. At that time, the pertinent regulatory

scheme was the National Pollutant Discharge Elimination System ("NPDES") that was administered directly by the federal Environmental Protection Agency ("EPA"). Subsequently, 33 U.S.C. § 1342(b), (c) delegated authority to the states to establish their own programs in place of the EPA's. As a result, Kodak applied in July 1979 to renew its permit to the New York State Department of Environmental Conservation ("DEC"). The DEC declined to act on Kodak's renewal application, and Kodak's NPDES permit remained in effect. As part of the pending application for a SPDES permit, in April 1982 Kodak provided the DEC with a Form 2C describing estimated discharges of 164 substances from each of its outfalls. Kodak also submitted an Industrial Chemical Survey ("ICS") disclosing the amounts of certain chemicals used in Kodak's facility and whether they might appear in the plant's wastewater. Although the ICS originally requested information on 144 substances, including some broad classes such as "unspecified metals," the DEC restricted the inquiry to chemicals used in excess of specified minimum levels.

On the basis of these disclosures, DEC issued Kodak a SPDES permit, number 000–1643, effective November 1, 1984, establishing specific effluent limitations for approximately 25 pollutants.[1] The permit also included "action levels"[2] for five other pollutants as well as for three of the pollutants for which it had established effluent limits.[3] DEC further required Kodak to conduct a semi-annual scan of "EPA Volatile, Acid and Base/Neutral Fractions and PCB's priority pollutants on a 24–hr. composite sample." In May 1989, Kodak applied to renew the SPDES permit submitting a new Form 2C and ICS, but the 1984 permit will continue to remain in effect until DEC issues a final determination.

Kodak's SPDES permit contains both "general provisions" and "special reporting requirements" pursuant to EPA policy directives devised to implement the Clean Water Act and to DEC policy directives devised to implement both the Clean Water Act and New York law, N.Y.Envtl.Conserv.Law § 17–0815 (McKinney 1984).

The present action arises out of an ongoing dispute between Atlantic States and Kodak during which Atlantic States has claimed that Kodak both exceeded the effluent limits imposed by its SPDES permit and discharged pollutants for which Kodak had no discharge authorization. The procedural history of this dispute is set out in full in our previous decision, *Atlantic States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124 (2d Cir.1991) ("*Atlantic States I*"), familiarity with which is assumed.

On November 14, 1991, Atlantic States filed the complaint in the instant matter. The complaint alleged that Kodak had violated Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, by discharging large quantities of pollutants not listed in its SPDES permit.[4] The complaint alleged standing to bring suit under the "citizen

1. UOD, TKN, Ammonia, BOD$_5$, oil & grease, phosphorus, cyanide, cadmium, chromium, copper, iron, lead, nickel, silver (total and ionic), zinc, mercury, chloroform, 4–Chloro–3,5–dimethylphenol, 1,2–Dichloroethane, 1,2–Dichloropropane, N,N–Dimethylaniline, Dichloromethane, Pyridine, and Xylene.

2. If the action level is exceeded, the permittee must undertake a "short-term, high-intensity monitoring program." If levels higher than the action levels are confirmed, the permit is reopened for consideration of revised action levels or effluent limits.

3. The permit set action levels for arsenic, 4,4'Butylidenebis–(6–t–butyl–m–cresol), Isophorone, 1,2,4–Trichlorobenzene, and Triphenyl Phosphate, as well as for Chromium, Copper, and Ammonia which already had established effluent limits.

4. Specifically, the complaint alleged that Kodak had discharged "282,744 pounds of unpermitted pollutants in 1987, 308,537 pounds in 1988, 321,456 pounds in 1989[,] and 290,121 pounds in 1990," and that Atlantic States believed that Kodak continued to discharge such pollutants. The 27 substances Atlantic States alleged that Kodak discharged were acetonitrile, acetone, carbon tetrachloride, catechol, cyclohexane, dibutyl phthalate, diethanolamine, ethylene glycol, glycol ethers, formaldehyde, hydroquinone, manganese, methanol, methyl ethyl ketone, methyl isobutyl ketone, n-butyl alcohol, nitrobenzene, 1,1,1–trichloroethane, 1,1,2–trichloroethane, 1,4–dioxane, 2–ethoxyethanol, 2–methoxyethanol, tert-butyl alcohol, toluene, and trichloroethylene.

suits" provision of the Clean Water Act, 33 U.S.C. § 1365. The CWA authorizes any "person or persons having an interest which is or may be adversely affected," to "commence a civil action on his own behalf against any person ... who is alleged to be in violation of ... an effluent standard or limitation under [the Clean Water Act]" in the district court. 33 U.S.C. § 1365(a), (g). As relief, Atlantic States requested a declaratory judgment as to the alleged violations, an injunction against future violations, authorization for Atlantic States itself to monitor Kodak's wastewater discharges at Kodak's expense for a period of one year after Kodak ceases the alleged violations, copies of all reports and documents filed with EPA or DEC during the same time period, civil penalties of $25,000 per day of violation for each alleged violation, and costs, including attorneys' and witnesses' fees.

After discovery, Atlantic States moved for partial summary judgment as to Kodak's liability in relation to the post-April 1, 1990 [5] discharge of one or more of 16 of the 27 pollutants listed in the complaint. The 16 pollutants [6] are all listed as toxic chemicals under Section 313(c) of the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11023(c). Atlantic States argued that General Provision 1(b) of the SPDES permit and Section 301 of the CWA, 33 U.S.C. § 1311, prohibit absolutely the discharge of any pollutant not specifically authorized under Kodak's SPDES permit. Kodak made a cross-motion for summary judgment on the ground that neither the CWA nor the federal regulations implementing it prohibit discharge of pollutants not specifically assigned effluent limitations in an NPDES or SPDES permit. Kodak further argued that, to the extent the permit may have prohibited discharges of these pollutants, this prohibition is broader than that of the federal NPDES program and therefore not enforceable through a citizen suit under 33 U.S.C. § 1365. On December 28, 1992, the district court denied Atlantic States' motion for partial summary judgment, granted Kodak's cross-motion for summary judgment, and dismissed the case. *Atlantic States Legal Found., Inc. v. Eastman Kodak Co.*, 809 F.Supp. 1040 (W.D.N.Y.1992). Atlantic States appealed from the judgment entered on that order.

## DISCUSSION

None of the material facts are in dispute [7] and this matter may be properly disposed of by summary judgment.

Atlantic States brought the present action under the citizen suit provision of Section 505, which permits private suits to enforce a CWA "effluent standard or limitation." 33 U.S.C. § 1365(a)(1)(A). Section 505 defines such an enforceable standard or limitation as, *inter alia*, "an unlawful act under ... section 1311," and "a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter." 33 U.S.C. § 1365(f)(1), (6). The question then is whether Atlantic States' action seeks to enforce an "effluent standard or limitation" im-

---

5. The Order on Consent, entered into April 5, 1990, between Kodak and DEC resolved the question of Kodak's liability for discharges before April 1, 1990. *See Atlantic States I*, 933 F.2d at 126–27.

6. Acetonitrile, acetone, dibutyl phthalate, diethanolamine, ethylene glycol, glycol ethers, manganese, methanol, methyl ethyl ketone, methyl isobutyl ketone, n-butyl alcohol, 1,1,1–trichloroethane, 1,1,2–trichloroethane, 1,4–dioxane, 2–methoxyethanol, and toluene.

7. Atlantic States' contentions regarding the number and amount of pollutants discharged are not material given our disposition of this matter. Of the 16 substances on which Atlantic States moved for partial summary judgment, seven were listed by Kodak in its permit application,

Form 2C, or ICS, or were specifically mentioned in the DEC's 1988 Notice Letter: dibutyl phthalate, ethylene glycol, manganese, 1,4–dioxane, 1,1,1–trichloroethane, 1,1,2–trichloroethane, and toluene. These substances received specific regulatory inquiry. The remaining nine substances appeared on Kodak's Form R's, the source of Atlantic States' information. Kodak must file annually Form R's, a Toxic Chemical Release Inventory Reporting Form, with both EPA and DEC, pursuant to 42 U.S.C. § 11023. Although not listed in Kodak's SPDES permit, these substances were subject to DEC regulation. Even had there been no regulation of the particular substances, Atlantic States would still not have standing to sue unless it could show violations of established regulatory limits.

posed by the Act or by Kodak's SPDES permit issued by the DEC.

### A. *"Standards and Limitations" of the Clean Water Act*

■ Atlantic States argues first that the plain language of Section 301 of the CWA, 33 U.S.C. § 1311, prohibits the discharge of any pollutants not expressly permitted. With regard to this claim, therefore, Atlantic States' standing to bring this action turns on the merits of the action itself.

Section 301(a) reads: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." This prohibition is tempered, however, by a self-referential host of exceptions that allow the discharge of many pollutants once a polluter has complied with the regulatory program of the CWA. The exception relevant to the instant matter is contained in Section 402, which outlines the NPDES, 33 U.S.C. § 1342(a), and specifies the requirements for suspending the national system with the submission of an approved state program, 33 U.S.C. § 1342(b), (c). Section 402(k) contains the so-called "shield provision," 33 U.S.C. § 1342(k), which defines compliance with a NPDES or SPDES permit as compliance with Section 301 for the purposes of the CWA's enforcement provisions. The Supreme Court has noted that "The purpose of [Section 402(k)] seems to be ... to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n. 28, 97 S.Ct. 965, 980 n. 28, 51 L.Ed.2d 204 (1977).

Atlantic States' view of the regulatory framework stands that scheme on its head. Atlantic States treats permits as establishing

limited permission for the discharge of identified pollutants and a prohibition on the discharge of unidentified pollutants. Viewing the regulatory scheme as a whole, however, it is clear that the permit is intended to identify and limit the most harmful pollutants while leaving the control of the vast number of other pollutants to disclosure requirements. Once within the NPDES or SPDES scheme, therefore, polluters may discharge pollutants not specifically listed in their permits so long as they comply with the appropriate reporting requirements and abide by any new limitations when imposed on such pollutants.[8]

The EPA lists tens of thousands of different chemical substances in the Toxic Substances Control Act Chemical Substance Inventory pursuant to 15 U.S.C. § 2607(b) (1988). However, the EPA does not demand even information regarding each of the many thousand chemical substances potentially present in a manufacturer's wastewater because "it is impossible to identify and rationally limit every chemical or compound present in a discharge of pollutants." Memorandum from EPA Deputy Assistant Administrator for Water Enforcement Jeffrey G. Miller to Regional Enforcement Director, Region V, at 2 (Apr. 28, 1976). "Compliance with such a permit would be impossible and anybody seeking to harass a permittee need only analyze that permittee's discharge until determining the presence of a substance not identified in the permit." *Id.* Indeed, at oral argument Atlantic States could provide no principled reason why water itself, which is conceded to be a chemical, would not be considered a "pollutant" under its view of the Act.

The EPA has never acted in any way to suggest that Atlantic States' absolutist and wholly impractical view of the legal effect of a permit is valid.[9] In fact, the EPA's actions

---

8. The cases Atlantic States cites are therefore inapposite because each involves either a failure to correctly disclose accurately the discharge of pollutants and thus comply with regulation or a failure to secure the requisite NPDES or SPDES permit. *Atlantic States Legal Found., Inc. v. Reynolds Metals Co.*, 31 Env't Rep.Cas. (BNA) 1156, 1158 (N.D.N.Y.1990) (failing to "apply proper detection"); *United States v. Tom–Kat Development, Inc.*, 614 F.Supp. 613 (D.Alaska 1985) (failing to obtain permit); *Kitlutsisti v. ARCO*

*Alaska, Inc.*, 592 F.Supp. 832 (D.Alaska 1984) (failing to obtain permit), *vacated on other grounds*, 782 F.2d 800 (9th Cir.1986); *Love v. New York State Dep't of Envt'l Conservation*, 529 F.Supp. 832 (S.D.N.Y.1981) (failing to obtain proper permit).

9. Atlantic States' citations to allegedly contrary authority are again inapposite. Atlantic States relies on the court's summary of the U.S. Attorney's argument in a footnote to an unpublished

and policy statements have frequently contemplated discharges of pollutants not listed under a NPDES or SPDES permit. It has addressed such discharges by amending the permit to list and limit a pollutant when necessary to safeguard the environment without considering pre-amendment discharges to be violations calling for enforcement under the CWA. 33 U.S.C. §§ 1319, 1365. The EPA thus stated in its comments on proposed 40 C.F.R. § 122.68(a), which applied the "application-based" limits approach to implementation of the CWA reporting scheme,

> There is still some possibility ... that a [NPDES or SPDES] permittee may discharge a large amount of a pollutant not limited in its permit, and EPA will not be able to take enforcement action against the permittee as long as the permittee complies with the notification requirements [pursuant to the CWA].

45 Fed.Reg. 33516, 33523 (1980). The EPA's statement went on to note that this possibility constituted a "regulatory gap," and that, "the final regulations control discharges only of the pollutants listed in the [NPDES or SPDES] permit application, which consist primarily of the listed toxic pollutants and designated hazardous substances." *Id.* In a clarification of EPA policy on Section 304, 33 U.S.C. § 1314, and water quality-based effluent limitations, an EPA official recently stated that:

> EPA did not intend to require water quality-based permit limitations on all pollutants contained in a discharge.... The proper interpretation of the regulations is that developing water quality-based limitations is a step-by-step process.... [W]ater quality-based limits are established where the permitting authority reasonably anticipates the discharge of pollutants by the permittee at levels that have the reasonable potential to cause or contribute to an excursion above any state water quality criterion....

opinion in the Western District of Louisiana, *United States v. Tennessee Gas Pipeline Co.,* No. 91–1428, slip op. at 5 n. 4 (W.D.La. Oct. 8, 1991), and a U.S. Attorney's brief in an Alaska case, not signed by any EPA lawyer, involving *inaccurate* reporting of effluent data, Memorandum in Op-

Memorandum from Director, Office of Wastewater Enforcement and Compliance to Water Management Division Directors, Regions I–X, at 2–3 (Aug. 14, 1992).

■ The EPA is the federal agency entrusted with administration and enforcement of the CWA. 33 U.S.C. § 1251(d). As such, EPA's reasonable interpretations of the Act are due deferential treatment in the courts. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). As the Supreme Court has noted in regard to EPA interpretation of the CWA,

> we need not find that it is the only permissible construction that EPA might have adopted but only that EPA's understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA.

*Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (quoting *Train v. National Resources Defense Council,* 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 1479–80, 1485, 43 L.Ed.2d 731 (1975)). Because the EPA's implementation of the CWA is entirely reasonable, we defer to it.

### B. *New York Environmental "Standards and Limitations"*

■ Atlantic States argues alternatively that the permit itself provides grounds for enforcement of New York State's regulations. States may enact stricter standards for wastewater effluents than mandated by the CWA and federal EPA regulations. 33 U.S.C. § 1342(b). These states' standards may be enforced under the CWA by the states or the EPA, 33 U.S.C. § 1342(h), but private citizens have no standing to do so. New York chose to implement its own environmental policies through its DEC's issuance of SPDES permits pursuant to

position to Defendant's Motion for Partial Summary Judgment and in Support of United States' Cross–Motion for Partial Summary Judgment, *United States v. Ketchikan Pulp Co.,* No. A92–587 (D.Alaska Dec. 14, 1992).

N.Y.Envtl.Conserv.Law § 17–0815 (McKinney 1984).

However, state regulations, including the provisions of SPDES permits, which mandate "a greater scope of coverage than that required" by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365. 40 C.F.R. § 123.1(i)(2). *Cf. United States Dep't of Energy v. Ohio,* — U.S. —, —, 112 S.Ct. 1627, 1638, 118 L.Ed.2d 255 (1992) (holding that "penalties prescribed by state statutes approved by EPA and supplanting the CWA" did not "arise under federal law" and thus could not be enforced under 33 U.S.C. § 1319).

Atlantic States relies heavily on General Provision 1(b) of the SPDES permit to show a violation of the CWA. In particular, Atlantic States points to the final clause of that provision that requires, pursuant to N.Y.Envtl.Conserv.Law § 17–0815(3), that

the discharge of any pollutant not identified and authorized or the discharge of any pollutant more frequently than or at a level in excess of that identified and authorized by this permit shall constitute a violation of the terms and conditions of this permit.

However, General Provision 1(b) itself contemplates "new, increased or decreased discharges" that do not "violate the effluent limitations specified in this permit."[10] Moreover, Special Reporting Requirement 2(a) of the SPDES permit specifically contemplates discharges of pollutants not identified by the permit. It states, in relevant part:

All existing manufacturing ... dischargers must notify the [DEC] as soon as they know or have reason to believe ... [t]hat they have begun or expect to begin to use or manufacture as an intermediate or final

product or byproduct any toxic pollutant which was not reported in the permit application.

Kodak also must file annually with both EPA and DEC a Toxic Chemical Release Inventory Reporting Form ("Form R"), pursuant to 42 U.S.C. § 11023. Form R's contain estimates of discharges of 317 chemicals and 20 "categories" of chemicals based on the amounts used in the manufacturing process, 42 U.S.C. § 11023(g)(2), 40 C.F.R. § 372.65, but they do not include more precise measurements based on actual discharges such as Non–Compliance Reports and monthly Discharge Monitoring Reports required under 33 U.S.C. § 1318.

Like the SPDES permit, the DEC itself contemplates the discharge of unlisted pollutants. In September 1988, DEC notified Kodak that it was aware of 45 substances "reported to have releases to the Genesee River" out of which only 23 were "specifically limited or monitored by the SPDES permit." DEC advised Kodak that although the bulk of these 23 substances either did not appear to be a major concern, or at least did not "appear to be acutely toxic to aquatic life at the levels of discharge indicated," the remaining four[11] should receive "additional attention."

It thus appears that the DEC's view of the SPDES permit is the same as the EPA's. If so, Atlantic States' action fails for reasons stated in Point A above. We need not resolve the issue, however, for, even if Atlantic States is right about New York law, the action would fail because New York would be implementing a regulatory scheme broader than the CWA, *see Atlantic States Legal Found., Inc. v. Eastman Kodak Co.,* 809 F.Supp. at 1048, and such broader state

---

**10.** General Provision 1(b) reads:
  b. All discharges authorized by this permit shall be consistent with the terms and conditions of this permit; facility expansions, production increases, decreases, or process modifications which result in new, increased or decreased discharges of pollutants must be reported by submission of a new SPDES application or, if such new, increased, or decreased discharge does not violate the effluent limitations specified in this permit, by submission to the permit issuing authority of notice of such new or increased discharges of pollutants (in

which case the permit may be modified to specify effluent limitations or any pollutants not identified and limited herein); the discharge of any pollutant not identified and authorized or the discharge of any pollutant more frequently than or at a level in excess of that identified and authorized by this permit shall constitute a violation of the terms and conditions of this permit.

**11.** Ethylene glycol, hydroquinone, manganese compounds, and 1,4–dioxane.

schemes are unenforceable through Section 505 citizen suits. A citizen's suit under Section 505 is thus barred either because Section 17–0815(3) and the final clause of General Provision 1(b) implement a program with broader scope than that promulgated under the CWA and EPA regulations or because the permit more narrowly interpreted shields Kodak from such an action.

## CONCLUSION

For the reasons stated above, we affirm the order of the district court granting summary judgment to Kodak.