**Stephen GILL; Dianne Gill; and Doris Hall, Plaintiffs,**

v.

**LDI; Wayne L. Schuett; and, Norma Jean Schuett, and the marital community composed thereof, Defendants.**

No. C97–461Z.

United States District Court, W.D. Washington.

June 29, 1998.

Richard A. Smith, Smith & Lowney, PLLC, Seattle, WA, for Plaintiffs.

Cedric Thomas Tuohy, Tuohy & Minor, Everett, WA, for Defendants.

### ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT ON LIABILITY

ZILLY, District Judge.

THIS MATTER comes before the court on plaintiffs' motions for summary judgment on their claim that defendant has violated the Clean Water Act of 1972, 33 U.S.C. § 1251 *et seq.* ("CWA"), and on pendent state trespass and nuisance claims. Plaintiffs claim that defendant's quarry operation adjacent to their property has trespassed on their property by polluting their pond, has caused various nuisances, and has otherwise violated the CWA. Having reviewed the documents in support and opposition to the motions, the Court now GRANTS the plaintiffs' motions for summary judgment as to liability on all three claims.

### I

### Background

This suit arises from a long-standing dispute between adjacent property owners in rural Snohomish County. Plaintiff Doris Hall and her husband purchased a home on a multiple acre lot with a pristine pond of several acres in 1968. With the property came a water right in the springs feeding the pond, granted to the Hall's predecessor by the State of Washington. The other two plaintiffs are Ms. Hall's daughter and son-in-law, Dianne and Stephen Gill, who now live with her on the property.

Wayne Schuett purchased property next to the Hall property in 1988 and established a quarry operation. He, his company, LDI, and his wife are the defendants in the case. Plaintiffs contend that the quarry operation discharges plumes of silt into their pond through a spring that lies under and next to the quarry and feeds their pond. The silt is blamed for their sudden inability to continue raising fish in the pond and allegedly makes it impossible to use the water for domestic or recreational purposes. Plaintiffs also contend that the operation pollutes a beaver pond that straddles the properties and feeds the Stillaguamish River, causes unbearable noise, and occasionally deposits rocks and other debris on their property.

Repeated complaints from the plaintiffs and their neighbors have led to some action by Snohomish County and the state Department of Ecology ("DOE"). In 1991, Snohomish County issued an order requiring Mr. Schuett to obtain a conditional use permit prior to continuing his operations. A hearing examiner upheld the order but opined that Mr. Schuett could operate without a license if he provided rock only for "forest practices" such as building roads. Claiming that he limits his sales to such activities, Mr. Schuett has not gotten a conditional use permit, and the county has not brought an enforcement action. In 1996, the DOE found that Mr. Schuett required a pollutant discharge permit under the Clean Water Act ("CWA"). Later, Mr. Schuett obtained a permit and belatedly fulfilled the planning and best management practices requirements in the permit. Plaintiffs brought suit in this Court in March of 1997. Mr. Schuett claims to have "cleaned up his act" in March of 1998.

### II

### Discussion

#### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interroga-

tories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The moving party has the initial burden of identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In assessing whether a party has met this burden, the court must view the evidence and the inferences drawn from that evidence in the light most favorable to the non-moving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982).

If the moving party meets its burden, the burden shifts to the opposing party to present specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party may not rely on the mere allegations in its pleadings in order to preclude summary judgment. *T.W. Electrical Serv. v. Pacific Elec. Contractors Assoc.,* 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted). Rule 56(e) requires the non-moving party to set forth, by affidavit or as otherwise provided in Rule 56, *"specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P.Rule 56(e) (emphasis added). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49 (2nd Cir.1985); *Thornhill Publishing Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). If the nonmoving party fails to assert specific facts, beyond the mere allegations or denials in its response, summary judgment, if appropriate, shall be entered. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186–87, 111 L.Ed.2d 695 (1990); *T.W.Elec.Serv.,* 809 F.2d at 630; Fed. R.Civ.P. 56(e).

Plaintiffs move for summary judgment on three claims: (1) LDI has violated the Clean Water Act, (2) LDI has trespassed on their property, and (3) LDI's operations are a nuisance per se. LDI opposes all three motions and argues that the case should be dismissed because plaintiffs have failed to

join an indispensable party, North Central Construction, Inc., co-owner of the property on which LDI's quarrying activities take place.

**B. Clean Water Act Claims**

The CWA authorizes citizen suits brought by "any citizen" on his own behalf

against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator [of the EPA] or a State with respect to such standard or limitation.

33 U.S.C. § 1365(a)(1). For the purposes of this citizen suit provision, the term "effluent standard or limitation under this chapter" includes "a permit or condition thereof." 33 U.S.C. § 1365(f).

Persons bringing a citizen's suit against an alleged CWA violator must clear three hurdles. They must prove that (1) they have standing to bring a complaint, (2) they have provided the alleged violator with a notice listing the alleged violations of the CWA at least sixty days prior to filing their suit, and (3) the defendant was engaged in ongoing violations at the time the complaint was filed. LDI challenges plaintiffs' ability to meet the last two requirements for a citizens suit.

**1. Standing**

To demonstrate standing under Article III of the Constitution, plaintiffs must show that (1) they have suffered an injury, (2) fairly traceable to the defendant's discharges, (3) which are likely to be redressed if plaintiffs were to prevail in the action. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). This three-part test is easily satisfied in this case, and defendants, do not content that the plaintiffs lack standing to bring a CWA suit.

**2. Notice**

■ The CWA states that no action may be commenced by a citizen under the Act prior to sixty days after the citizen notifies the EPA, the state CWA administrator, and the alleged violator of the alleged violation. 33 U.S.C. § 1365(b). The Gills sent three

notice letters to the relevant parties. LDI complains that the final letter, dated February 19, 1998 was sent less than sixty days before the plaintiffs were allowed to amend their complaint on March 26, 1998, to include the allegations listed in that notice. LDI is correct. All of the allegations on which plaintiffs' motion for summary judgment is based, however, were included in plaintiffs' first two notice letters, dated December 20, 1996, and March 24, 1997, both of which were submitted more than sixty days prior to the filing of the original and first amended complaints respectively.[1] For the purposes of this summary judgment motion, the Gills gave LDI the notice it was due under the CWA.

### 3. Ongoing Violations
#### a. Plaintiffs' Case

Plaintiffs must show that violations are ongoing at the time the complaint is filed. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Plaintiffs argue that LDI has engaged in ongoing violations of at least eight conditions of its permit, including conditions (1) S2.A.1 (quarterly water quality monitoring), (2) S4.B (timely implementation of Storm Water Pollution Prevention Plan ("SWPPP")), (3) S4.C (timely implementation of Storm Water Pollution Prevention Plan for Erosion and Sediment Control ("SWPPP/ESC")), (4) S6 (SWPPP contents and requirements), (5) S7 (SWPPP/ESC contents and requirements), (6) S9.A (Storm Water Inspections and Monitoring), (7) S9B. (Storm Water Reports and Recordkeeping), and (8) S12 (Compliance with Washington State Water Quality Standards).

All of plaintiffs' allegations are supported either by declarations and exhibits they have presented with their motions for summary judgment or by admissions of the defendant. A brief summary of the evidence supporting the allegations follows:

(1) While Mr. Schuett has submitted a log of water samplings, it does not appear that he has sampled the springs feeding plaintiffs pond, from which it is allegedly polluted. His declaration admits that he has not gone near the plaintiff's pond.

(2) & (3) Mr. Schuett admitted in his deposition that he did not prepare and implement the SWPPP and SWPPP/ESC in a timely manner. Declaration of R. Smith, CR 44, Exhibit I, pp. 151–52.

(4) & (5) On pages four and five of their Memorandum in Support of Motion for Summary Judgment on Clean Water Act Liability, plaintiffs list a number of the elements of an SWPPP and an SWPPP/ESC that defendants omitted entirely from their plans. LDI's original SWPPP is in fact very bare bones and seems to demonstrate that Mr. Schuett did not take the requirements of the NPDES permit seriously. *See* Declaration of R. Smith, CR 44, Exhibit F. Schuett's answers to several questions in his deposition on June 16, 1997, confirm this fact. *See* Declaration of R. Smith, CR 44, Exhibit I, pp. 188, 194, 199, 203. In fact, Mr. Schuett admitted in his deposition, taken several months after the complaint was filed, that he had not made any plans under his permit or taken any measures to avoid polluting the plaintiff's pond. *See* Declaration of R. Smith, CR 44, Exhibit I, p. 194.

(6) & (7) As with allegation (1), the Mr. Schuett has presented a list of water sample inspections, but it is bare bones, and it does not appear to include tests of the springs going to plaintiff's pond until March of 1998. Mr. Schuett admitted in his deposition that he did not prepare the inspection reports required by condition S9.B of his permit. Declaration of R. Smith, CR 44, Exhibit I, p. 208.

(8) Plaintiffs have produced several affidavits regarding the continued pollution of their pond and have also produced a videotape showing the pollution. Declaration of Stephen Gill, CR 46, Exhibit V1. In addition to their claims that the turbidity of the silt released into their pond is far over the state turbidity standards, WAC 173–201A–

---

1. Plaintiffs' third letter and the second amended complaint appear to add only one further allegation: that LDI failed to send a copy of the reports it is required to prepare under its NPDES permit to the Washington Department of Ecology, the state CWA administrator.

030(1)(c)(vi), they also cite (1) the proscription of pollution by materials that offend the sense of sight, smell, touch, or taste, WAC 173–201A–030(1)(c)(viii), and (2) the requirement that waters be fit for their characteristic uses. WAC 173–201A–030(2)(b), –070(1). The proscription of offensive materials does not appear to apply here because it excludes "materials of natural origin." The requirement that waters remain fit for characteristic uses does apply, however, and the plaintiffs have submitted affidavits stating that they cannot use the water for swimming or raising fish when it is polluted by the defendant's activities. *See* Declaration of Doris Hall, CR 49, ¶ 8; Declaration of Stephen Gill, CR 46, ¶ 5; Declaration of Dianne Gill, CR 50, ¶ 6. Plaintiffs also complain that Schuett is polluting the beaver pond straddling the two properties and that the plaintiffs' traditional uses of that pond for fishing and wildlife viewing have been disrupted.

All of these violations are ongoing because they have continued after the date that the Complaint was filed, March 24, 1997, as well as beyond the date on which the First Amended Complaint was filed, May 28, 1997. *Sierra Club v. Union Oil of California,* 853 F.2d 667, 671 (9th Cir.1988). Based on these allegations, the plaintiffs contend that LDI has engaged in a total of 5,101 violations of the CWA. Their calculations appear to be correct. *See Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109, 1112 and n. 2, n. 11 (4th Cir.1988); *Hawaii's Thousand Friends v. City of Honolulu,* 821 F.Supp. 1368, 1393–94 (D.Hawai'i 1993).

**b. LDI's Arguments**

LDI makes five arguments opposing plaintiffs' contention that it was engaging in ongoing violations at the time this case was filed. LDI argues that (1) the only instance on which they exceeded the effluent limitations in their permit occurred prior to this suit, (2) broader or more restrictive state standards cannot be the subject of a citizen's suit, (3) effluent discharge violations are the only violations that count, (4) this suit has been rendered moot by changes LDI has made in its operations since March 16, 1998, and (5) LDI's operation is not required to have a permit because it produce contaminated storm water and it is not a point source.

**i. Effluent Limitations**

LDI argues that the plaintiffs have only provided evidence of one instance in which the discharges from the quarry into plaintiff's pond exceeded the maximum daily turbidity limitation for storm water of 50 nephalometric turbidity units ("NTU") listed as condition S1.F of the permit. That is correct. The Declaration of Mackey Smith, the plaintiff's expert witness notes that he conducted a test on November 27, 1996, in which the turbidity of the plaintiffs' pond measured 52 NTU. Declaration of Mackey Smith, CR 47, p. 8. Plaintiffs have not based their summary judgment motion, however, on violation of the effluent standard listed in condition S1.F of the permit. They base their motion on violations of state effluent standards and various technical conditions of the permit.

**ii. State Standards**

■ Plaintiffs have provided evidence of numerous instances in which discharges from defendant's property clouded their pond with a thick plume of silt. Plaintiffs allege that these discharges were violations of state turbidity limitations (no more than 5 NTU over baseline turbidity), which are incorporated into the permit by reference in condition S12 of the permit. LDI correctly points out that the plaintiffs have not provided any objective evidence that the state turbidity limitations were violated, although the photos and videotape submitted by the plaintiffs with their declarations suggest that the water is heavily polluted when the silt plumes enter the pond from the springs attached to defendant's property. Even if the turbidity limitations were not violated, however, the plaintiffs have submitted evidence, in the form of an expert opinion and statements of their own experience, that the pond is not fit for its characteristic uses of domestic water supply, recreation, and fish raising, when it is polluted by the defendant's activities. As noted above, Washington state water quality standards require that state waterways remain fit for their characteristic uses. In that regard, at least, defendants have violated the state standards condition in their permit.

■ LDI argues that broader or more restrictive state standards may not be enforced in citizen suits, citing *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.,* 12 F.3d 353, 358 (2nd Cir.1993), *cert. denied* 513 U.S. 811, 115 S.Ct. 62, 130 L.Ed.2d 19 (1994). In *ASLF v. Eastman Kodak,* the Second Circuit held that state standards "which mandate 'a greater scope of coverage than that required' by the Federal CWA and its implementing regulations are not enforceable through a citizen's suit." *Id.* at 359. The Ninth Circuit rule, however, is that state standards, including narrative as opposed to numerical criteria, incorporated into an NPDES permit may be enforced through a citizens' suit. *Northwest Environmental Advocates v. Portland,* 56 F.3d 979 (9th Cir. 1995) (*citing Jefferson County v. Washington Department of Ecology,* 511 U.S. 700, 114 S.Ct. 1900, 1910–14, 128 L.Ed.2d 716 (1994)), *cert. denied,* 518 U.S. 1018, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996). *See also Washington Practice 23: Environmental Law and Practice,* § 7.163 n. 1 (noting that whether or not state standard is explicitly included in NPDES permit is factor distinguishing *ASLF v. Eastman Kodak* from *NEA v. Portland* ).

### iii. Only Discharge Violations Count

In any case, LDI is wrong when it asserts that the only violations that count are discharge violations. In *Sierra Club v. Simkins Industries,* 847 F.2d 1109 (4th Cir.1988), a polluter argued that the phrase "an effluent standard or limitation," found in 33 U.S.C. § 1365(a) should be construed to exclude citizen suits that do not allege discharge of pollutants in violation of permit limitations. The Fourth Circuit disagreed, noting that section 1365 defines an "effluent standard or limitation" to include "a permit or condition thereof issued under section 1342 of this title." *Id.* at 1115 (citing 33 U.S.C. § 1365(f)(6)). The court also explained that violations of planning, monitoring, and reporting requirements are also important because those conditions are the only way in which compliance with discharge limitations can be guaranteed. *Id.* at 1115 n. 9 (calling reporting requirements "essential elements of the CWA's enforcement procedures").

■ Violation of any condition in an NPDES permit is considered a violation of the CWA. *Simkins Industries,* 847 F.2d 1109, 1111 (4th Cir.1988); *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368, 1392 (D.Hawai'i 1993). "The plain language of [33 U.S.C. § 1365] authorizes citizens to enforce all permit conditions." *Northwest Environmental Advocates v. Portland,* 56 F.3d 979, 986–89 (9th Cir.1995). Furthermore, liability for violation of the CWA is strict—there is no *de minimis* defense. *Sierra Club v. Union Oil of California,* 813 F.2d 1480, 1490–91 (9th Cir.1987), *vacated,* 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988), *reinstated,* 853 F.2d 667 (9th Cir.1988); *Hawaii's Thousand Friends,* 821 F.Supp. at 1392 (D.Hawai'i 1993).

### iv. Mootness

LDI argues that the plaintiffs' suit is moot because, as of March 16, 1998, they have instituted measures which can reasonably be expected to ensure that, if any siltation of plaintiffs' pond was due to their activities, that will no longer occur. Mootness prevents the maintenance of a citizens' suit under the CWA when "there is no reasonable expectation that the wrong will be repeated." *Gwaltney v. Chesapeake Bay Foundation,* 484 U.S. 49, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

LDI alleges that based on the recommendations of a geological consultant, it has ceased activity in the part of their quarry located most closely to the springs feeding plaintiffs' pond. Declaration of James Minard, CR 71, 1.12, p. 7; Declaration of Wayne Schuett, CR 68, 1.18, pp. 14–15 and Exhibit D. They have also instituted numerous other measures to prevent storm water from draining into plaintiffs' property. *Id.* In his declaration, Mr. Schuett also states that he has been working with representatives from the Washington Department of Ecology to bring his SWPPP and his monitoring and reporting practices into compliance with his permit. Declaration of Wayne Schuett, CR 68, 1.20–21, p. 17. LDI's geological consultant states that he has inspected the springs feeding plaintiffs' pond on 21

occasions since these changes were made to the LDI operation, and the springs were always clear. Declaration of James Minard, CR 71, 1.09, p. 6. An official of the Department of Ecology also stated in a letter to Mr. Schuett that "there has been no evidence of significant spring turbidity since you ceased working in the lower quarry." Declaration of Wayne Schuett, CR 68, Exhibit M. The letter also states however, that "evaluation of the long-term effectiveness of lower quarry abandonment will probably take a full year of springflow quality observations." *Id.*

■ Where the plaintiffs have proven ongoing violations of the CWA at the time the suit was filed, however, a suit does not become moot because the violator has come into compliance after the suit was filed. *Atlantic States Legal Foundation v. Tyson Foods,* 897 F.2d 1128, 1135–36 (11th Cir. 1990); *Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 890 F.2d 690, 696–97 (4th Cir.1989). Thus, for the purposes of mootness, the relevant question is whether there was a basis for injunctive relief and civil penalties at the inception of the suit. *Id.* If so, a suit for civil penalties and litigation expenses can be maintained. *Northwest Environmental Advocates v. Portland,* 56 F.3d at 990.

### v. Permit Exemptions

■ LDI argues that NPDES permits are not required for discharges of storm water from mining operations "which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations." 33 U.S.C. § 1342(*l*). LDI argues that the alleged pollution "is simply rainwater coming into contact with natural silt and clay, which is not a product of the mining operation, but is a naturally occurrence [sic] under the surface of the mining operations. This argument is belied by the fact that the Washington Department of Ecology, to which the Environmental Protection Agency has delegated authority to enforce the CWA, determined that LDI required an NPDES permit under the CWA." Declaration of R. Smith, CR 44, Ex-

hibits A–D. In any case, this exemption would not apply because the discharge from LDI's property into plaintiffs' pond is the result of precipitation contacting raw material, i.e. the talus deposit in and below the quarry. Declaration of Mackey Smith, CR 47, p. 7.

■ LDI also argues that it is not required to carry a permit to discharge storm water because it is not a "point source." The CWA prohibits all discharges of pollutants from identifiable "point sources" to waters of the United States absent an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342. A "point source" is:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, [or] discrete fissure ... from which pollutants are or may be discharged.

33 U.S.C. § 1362(14) (1986 & Supp.1995). As above, the fact that Washington's Department of Ecology determined that LDI requires a permit weighs heavily against this contention. In addition, the fallacy of LDI's argument that it is not a point source is revealed by the following:

> This Court is persuaded by the reasoning of the Tenth Circuit in *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979), adopted by the Ninth Circuit in *Trustees for Alaska v. EPA,* 749 F.2d 549, 558 (9th Cir.1984). The Earth Sciences court noted that "point sources" must be interpreted broadly to effectuate the remedial purposes of the CWA. Earth Sciences, 599 F.2d at 373. **The non-point source designation is limited to uncollected runoff water which is difficult to ascribe to a single polluter.** *Trustees for Alaska,* 749 F.2d at 558.
>
> Even the EPA has stated its intent "to embrace the broadest possible definition of point source consistent with the legislative intent of the CWA." *See* 55 Fed.Reg. 47990, 47997 (Nov. 16, 1990) (preamble to Storm Water Regulations under NPDES). Although they are not authoritative, this Court is also persuaded by statements from EPA Region VIII regarding the definition of "point source." In a letter from

the Director of the Water Management Division, the EPA makes clear that "any seeps coming from identifiable sources of pollution (i.e., mine workings, land application sites, ponds, pits, etc.,) would need to be regulated by discharge permits." See Pls.' Ex. 28 in Supp. of Mot. at p. 2 (Letter edited by Director of the Water Management Division of EPA, Region VIII (emphasis added)). Further, the EPA has specifically stated, "It is EPA's position that mine adits such as the Glengarry Adit are clearly point sources as defined under ... the CWA ... and that the discharges from the Glengarry Adit are required ... to have an NPDES permit." See Pls.' Ex. 23 in Supp. of Mot. at P 5 (Declaration by Director of the Water Management Division of EPA, Region VIII). *Beartooth Alliance v. Crown Butte Mines,* 904 F.Supp. 1168, 1173–74 (D.Mt.1995) (emphasis added). The defendant was not exempt from the CWA's permit requirements. The plaintiffs have proved that the defendant engaged in numerous violations of the CWA and are entitled to summary judgement on that claim.

## C. Trespass Claim

Plaintiffs argue that LDI has trespassed against them by interfering with their exclusive possession of the pond on their property and water to which they hold a water right. They move for summary judgment on this claim. Plaintiffs rely on a four-part test for trespass established by the Washington State Supreme Court in *Bradley v. American Smelting and Refining Co.,* 104 Wash.2d 677, 691, 709 P.2d 782 (1985). In *Bradley,* the Washington court held that plaintiffs wishing to sue a company for the intangible and indirect trespass of microscopic airborne particles deposited on their property must show (1) an invasion affecting an interest in the exclusive possession of plaintiffs' property, (2) an intentional doing of the act which results in the invasion, (3) reasonable foreseeability that the act done could result in an invasion of plaintiffs' possessory interest, and (4) substantial damage to the *res. Id.* at 691, 709 P.2d 782. Plaintiffs argue that the silt

discharged by LDI's operations is a physical invasion of their property, that Mr. Schuett has intentionally carried on his rock quarry operation despite obviously foreseeable impacts on their property, and that it creates substantial damage to their property.

■ Defendants argue it is a question of fact whether they intended to cause a release of silt and clay. This argument misconstrues the law of trespass. The law does not require that the invasion or trespass itself be intentional—it is sufficient that the act resulting in the trespass is intentional. *Bradley,* 104 Wash.2d at 691, 709 P.2d 782. Defendants clearly intended to engage in quarrying activity.

■ Defendants also argue that it is a question of fact whether it was reasonably foreseeable that their activities would result in pollution of the plaintiffs' pond. Intent to trespass may include "an act that the actor undertakes realizing that there is a high probability of injury to others and yet the actor behaves with disregard of those likely consequences." *Bradley,* 104 Wash.2d at 684, 709 P.2d 782. LDI's quarry originally lay about fifteen feet away from the edge of plaintiffs' pond and about 100 feet from their house.[2] According to the Department of Ecology, the original quarry area, was on top of the springs supplying plaintiffs' pond with water. Declaration of Wayne Schuett, CR 68, Exhibit M. Under the circumstances, Schuett must have realized that his activity was the likely cause of the silt discharges in plaintiffs' pond and he worked the quarry anyway. He did not move his activity further away from the Gill's property until they sued him and his consultant recommended that he take such action. *Id.* at 1.18, p. 14.

■ LDI finally argues that plaintiffs cannot satisfy their burden to prove substantial damage to their property. While this may be true, it is not fatal to the plaintiffs' cause of action, because the substantial damages requirement of *Bradley* does not apply to this case. "Historically, an invasion must constitute an interference with possession in

**2.** According to LDI's consultant, all quarry activity has moved about 200 feet further away as of March 1998. Declaration of James Minard, CR 71, 1.12, p. 7.

order to be actionable as a trespass." *Mock v. Potlatch Corporation*, 786 F.Supp. 1545, 1548 (D.Idaho 1992). "The requirement of damages to the res limits 'trespass by airborne [or other intangible] pollutants' to cases in which there has occurred an injury that actually interferes with the right to possession." *Bradley v. American Smelting & Refining Co.*, 635 F.Supp. 1154, 1157 (W.D.Wash. 1986). Where there is an actual entry on the land, however, either by the defendant or by some tangible thing intruding on the land because of the defendant's actions, interference with the exclusive right of possession is assumed. *Mock*, 786 F.Supp. at 1548 (*citing* Restatement (Second) of Torts § 158(a) (1965), Keeton, *Prosser and Keeton on the Law of Torts*, § 13, at 67 (5th ed.1984)); *see also, Hedlund v. White*, 67 Wash.App. 409, 418, 836 P.2d 250 (1992) (acknowledging trespass and imposing an injunction even though trespass caused only *de minimis* damages to plaintiff's property). The distinction between the traditional trespass remedy and the modern remedy for intangible trespasses has been summarized as follows:

> If there is a direct and tangible invasion of another's property, there is an infringement of the right of exclusive possession, and the law will presume damages. On the other hand, if the invasion is indirect and intangible (such as noise, odors, light, smoke, etc.), the proper remedy lies in an action for nuisance, based on interference with the right of use and enjoyment of the land. However, if the intangible invasion causes substantial damage to the plaintiff's property, this damage will be considered to be an infringement on the plaintiff's right to exclusive possession, and an action for trespass may be brought.

*Mock*, 786 F.Supp. at 1550–51. Plaintiffs have provided a great deal of evidence of tangible invasions of their property, including silt plumes in their pond and rocks deposited on their lawn. Declaration of Stephen Gill, CR 46, ¶¶ 2, 3 and Exhibits; Declaration of Dianne Gill, CR 50, ¶ 3 and Exhibits; Declaration of Doris Hall, CR 49, ¶ 6. Defendants have not provided any evidence to rebut the plaintiffs' evidence. There is no genuine issue of material fact to be determined by a jury and plaintiffs are entitled to judgment as a matter of law.

## D. Nuisance Claim

■■■■ Plaintiffs claim that LDI's quarry is a nuisance because it interferes with their use and enjoyment of their property, both because of the pollution of their pond and because of the loud noises produced by LDI's activities. Under Washington law, a business activity that interferes with a person's use and enjoyment of their property may constitute a nuisance. *Tiegs v. Watts*, 135 Wash.2d 1, 954 P.2d 877, 879 (1998). If the activity is conducted lawfully, it only becomes a nuisance if it *unreasonably* interferes with a person's use or enjoyment of property. *Id.* If it is conducted unlawfully, that is in violation of statutes, regulations, or permits, and it interferes with someone's use and enjoyment of their property, it is a nuisance per se. *Id.*

Plaintiffs argue that LDI's operations are a nuisance per se in three respects: (1) they violate the requirements of their NPDES permit, (2) they violate noise regulations in the Snohomish County Code, and (3) they violate conditional use permit requirements of the Snohomish County Code. They have moved for summary judgment on all three points.

LDI contests each of plaintiffs' grounds for finding a nuisance per se. In addition, LDI argues that it is protected from nuisance actions by the Washington "Right to Farm" law, RCW 7.48.300. Its arguments are unavailing on all issues except the conditional use permit issue.

### 1. Nuisance Per Se: Violation of Water Quality Laws

■■■ There is no genuine issue of material fact as to whether LDI violated the provisions of its NPDES permit. Mr. Schuett admitted several violations of the permit's planning and monitoring requirements in his deposition. Mr. Schuett has not stated specific facts to contradict plaintiffs' allegations that the silt plumes invading their pond violate Washington state laws prohibiting water pollution rendering waterways unfit for their

characteristic uses. WAC 173–201A–070(1).[3] The Washington State Supreme Court has explicitly stated that "[d]ischarges in violation of permit requirements constitute a nuisance which subjects violators to damages." *Tiegs*, 135 Wash.2d 1, 954 P.2d 877, 879. It is also clear from the averments of the plaintiffs that these violations have interfered with the plaintiffs' use and enjoyment of their property, preventing them from swimming in and growing fish stocks in their pond.

LDI argues that the discharges attributed to its operation do not violate state water quality standards because the Department of Ecology is required to establish a mixing zone for discharges under WAC 173–201A–100, and if a mixing zone were established in this case there would be no violation. This argument fails, however, because the relevant regulation does not require the Department of Ecology to establish mixing zones for every polluter, and LDI has not proven that the Department of Ecology would be inclined to do so in its case.

### 2. Nuisance Per Se: Noise Control Laws

█ Plaintiffs argue that LDI's operations are a nuisance per se because they violate the relevant noise limits in Washington State regulations and the Snohomish County Code. Plaintiffs argue that because both their property and the defendant's property are zoned rural, the most restrictive noise standards apply. SCC 10.01.020(7)(a); WAC 173–060–030(2). Plaintiffs rely on the declaration of the sound expert, who concluded that noise from defendant's activities violated both the Washington state and Snohomish County noise limits. Declaration of Jerry Lilly, CR 48, ¶ 4, p. 5.

LDI begins its assault on plaintiffs' claim by noting correctly that the Snohomish County standards in place at the time that plaintiffs' expert took his measurements in August of 1996 were identical to, not more strict than, the standards in the relevant state regulation. LDI concludes correctly that the base sound level for the combination of plaintiffs' property, a Class A property, and defendant's property, a Class C property, was 60 dBA.[4] Finally, LDI notes that both the state regulation and the county code contain deviation provisions, which allow increases of 5 dBA for 15 minutes, 10dBA for 5 minutes, and 15 dBA for 1.5 minutes in every hour. SCC 10.01.070(2) (pre–1998); SCC 10.01.030(3) (post–1/1/98); WAC 173–60–040(2)(c).

Plaintiff's expert used the new county code standards in preparing his declaration, which makes it difficult to determine if his declaration proves that defendant violated the noise laws. Exhibits 7A, 7B and 7C of his declaration appear to correlate with the 15, 5 and 1.5 minute deviation provisions and suggest that there was no violation in any context since the 15 minute limit is 65 dBA, the 5 minute limit is 70 dBA, and the 1.5 minute limit is 75 dBA. On the other hand, Exhibit 7D shows numerous instances over several days in which the loudest noise in a given hour was well over 75 dBA, which suggests that there may have been violations of the noise laws. Defendants note correctly, however, that in the more closely calibrated test illustrated in Exhibit 9, the noise level from the quarry did not go much over 70 dBA and appeared to hover closer to 60 dBA. This presents a material issue of fact which precludes summary judgment on this issue.

### 3. Nuisance Per Se: Conditional Use Permit

█ Plaintiffs argue that LDI's operations are a nuisance per se because Mr. Schuett is operating without a conditional use permit, as required for quarry activities by the Snohomish County Code, and as ordered by a Hearing Examiner in 1991. SCC

---

3. As argued by LDI, and noted in the Clean Water Act section above, plaintiffs have not sufficiently proved that LDI's operations violated state turbidity regulations at any time after the initiation of this suit. Additionally, plaintiffs' allegation that the discharges violate state water quality aesthetic standards must fail because the relevant regulation excludes impairment by ma-

terials "of natural origin." WAC 173–201A–030(1)(c)(viii).

4. Under the Snohomish County Code in effect as of 1/1/98, this number would be substantially reduced to 49 dBA.

18.32.040(30); Declaration of R. Smith, CR 44, Exhibit K. This argument must fail, however, because the Hearing Examiner's order is ambiguous. The Examiner ostensibly sustained the order of the county that Mr. Schuett should cease his quarry activities until he had obtained a conditional use permit. That decision, however, was premised on the Examiner's finding that Mr. Schuett had sold his rock for uses other than forest practices on two prior occasions. The Examiner also found, however, that Mr. Schuett could conduct his quarrying activities outright (that is, without a permit,) on the portion of his property zoned F, as long as he sells the rock for forest practices. *Id.* at ¶ 16. Mr. Schuett maintains that he has only sold rock for forest practices and he therefore is not required to get a permit. Plaintiffs have failed to prove otherwise. They provide an affidavit of an individual who purchased rock from LDI, but that individual states that he used the rock to construct logging roads, which is a forest practice. RCW 76.09.020(8)(a); Declaration of Robert Haner, CR 75. Furthermore, Snohomish County has refused to prosecute Mr. Schuett for operating without a conditional use permit because it cannot be proved that he is selling rock for other than forest practices purposes. Declaration of Susan Edminster, CR 52, Exhibit A. Mr. Schuett's failure to procure a conditional use permit for his quarry does not constitute grounds for a finding of negligence per se.

### 4. Affirmative Defense: "Right to Farm" Law

■ LDI argues that it is protected from nuisance suits under Washington's "Right to Farm" law, RCW 7.48.300, which provides that:

> The legislature finds that agricultural activities conducted on farmland and forest practices in urbanizing areas are often subjected to nuisance lawsuits, and that such suits encourage and even force the premature removal of the lands from agricultural uses and timber productions. It is therefore the purpose of RCW 7.48.300 through 7.48.310 and 7.48.905 to provide the agricultural activities conducted on farmland

and forest practices be protected from nuisance lawsuits.

RCW 7.48.305 states that such activities, "if consistent with good ... practices and established prior to surrounding nonagricultural and nonforestry activities, are presumed to be reasonable and shall not be found to constitute a nuisance unless the activity has a substantial adverse effect on the public health and safety."

The defendant can find no solace in this statute because plaintiffs were there first. RCW 7.48.305 states explicitly that forest practices are only exempt when they are established prior to non-forest practices activities. The Washington Supreme Court has recently confirmed that the *raison d'etre* of the statute is to protect certain activities from encroachment by residential land uses. *Buchanan v. Simplot Feeders Limited Partnership*, 134 Wash.2d 673, 952 P.2d 610 (1998). In this case, the residence was there before defendants. While Mr. Schuett argues that the area was used for a quarry prior to the 1950s and prior to settlement by the plaintiffs' predecessors, the Snohomish County Hearing Examiner already concluded that the defendants could not get prior nonconforming use status under the county code based on activities that were so separated in scope and time from the defendant's activities in the 1980s and 1990s. *See* Declaration of R. Smith, CR 44, Exhibit K, ¶ 9, p. 8. In any case, LDI cannot benefit from the statute because it has not engaged in "good forestry practices" as demonstrated by the fact that it violated several water quality laws. *Buchanan*, 134 Wash.2d at 680, 952 P.2d 610.

### E. Failure to Join a Necessary Party

■ Defendants argue that this case should be dismissed because plaintiffs have failed to join an indispensable party, North Central Construction, 50% owner of the land on which LDI carries out its quarry activities. LDI argues that plaintiffs' quest for an injunction, if successful, would impair North Central's ownership rights and that it is therefore an indispensable party.

Plaintiffs effectively oppose this argument. Plaintiffs make four good points. First,

plaintiff notes that North Central's interest in the quarry operation is illusory. Mr. Schuett admitted in his deposition that he had not shared any of the income from the quarry with North Central and that he had not discussed the property with North Central's owner for over a year. Second, plaintiff argues persuasively that none of the three risks that make an absentee a necessary party under Rule 19(a), (1) inability of the Court to accord complete relief among the parties, (2) risk of harm to the absent party's ability to protect its interest, and (3) risk of harm to the defendants by subjecting them to double liability or inconsistent obligations, are present in this case. In support of this argument, plaintiff notes that neither (1) nor (3) apply here and that (2) is covered by the fact that North Central's interest in the property is adequately represented by LDI which also has a 50% stake in the property. *See Forest Conservation Council v. U.S. Forest Service,* 66 F.3d 1489, 1498–99 (9th Cir.1995). Third, even if this Court were to find North Central a necessary party, there is no evidence that it could not be joined, as required for dismissal under Rule 19(b). Fourth, defendant has failed to make a separate motion for dismissal as required under Local Rule 7(b). The defendant has not shown that this case must be dismissed for failure to join an indispensable party.

### III

### Order

Plaintiffs have shown that there are no issues of material fact whether the defendant has violated the CWA, whether the defendant has trespassed on their property, and whether the defendant has caused a nuisance through violations of the CWA. The plaintiffs' motions for summary judgment on those three claims are GRANTED. The plaintiffs' fourth motion in limine and motion to strike defendant's declarations and exhibits is stricken as moot in light of this ORDER.